[Civ. No. 19025.   Second Dist., Div. One.   Jan. 14, 1953.]

TRANSAMERICA CORPORATION (a Corporation), Respondent, v. THOMAS M. PARRINGTON, Appellant.

TRANSAMERICA CORPORATION (a Corporation), Respondent, v. W. T. SHEPHARD, Appellant.

TRANSAMERICA CORPORATION (a Corporation), Respondent, v. A. B. MUSICK, Appellant.

Vaughan, Brandlin & Wehrle, Warren J. Lane and Pat B. Trapp for Appellants.

Bodkin, Breslin & Luddy and Michael G. Luddy for Respondent.

PATROSSO, J. pro tem.—Plaintiff instituted these three separate actions seeking specific performance of an agreement executed by each of the defendants for the sale of corporate shares. The causes were consolidated and pursuant to stipulation were disposed of by a single set of findings and judgment. Defendants appeal from the judgment rendered in favor of the plaintiff upon the sole ground that the agreements in question are illegal and hence unenforceable.

In May, 1941, respondent (hereinafter sometimes referred to as Transamerica) acquired all of the stock, both common and preferred, of the Temple City National Bank (hereinafter referred to as the bank) including that then owned by appellants Shephard and Musick. For the shares acquired from Shephard respondent paid $317.15 a share and for those acquired from Musick $405.66 a share. Following the acquisition of the stock of the bank Transamerica sold to the appellants Shephard and Musick 10 shares each of the common stock at a price of $150 per share and they continued to serve as directors of the bank until their resignation in 1950. At the time of the sale of these shares to the appellants Shephard and Musick each executed a separate agreement with Transamerica agreeing that he would, upon ceasing to be a director of the bank, sell the said shares to Transamerica on its written requisition therefor at the price of $150 per

share plus 5 per cent interest from the date thereof to the date of purchase less the amount of any dividends paid on said shares. The agreement further provided that Transamerica was given the right of first refusal in the event that these appellants desired to dispose of their shares. It was also provided that the purchase price to be paid by Transamerica upon the purchase of the shares would entitle it to receive without additional payment all shares derivative therefrom by way of split, stock dividend or otherwise. Shortly after acquiring all the stock of the bank as stated Transamerica transferred to the bank for cancellation all of the preferred stock, and thereafter it continued to be the owner of all the outstanding shares thereof except 50 shares of common stock, 20 of which were owned by appellants Shephard and Musick and 10 each owned by the three other directors who had executed a similar agreement with Transamerica with respect to their shares. As a result of a declaration of a 50 per cent stock dividend Shephard and Musick received five shares of common stock at which time they entered into a new agreement with Transamerica identical in form with that previously executed except that the share price was reduced to $102.42, and at the same time Shephard and Musick sold to Transamerica five shares and received therefor the sum of $512. Subsequently, in order to fill a vacancy on the board caused by the death of one of the other directors Transamerica sold 10 shares of the stock of the bank to the appellant Parrington for $100 a share who executed a similar agreement with Transamerica except that the price at which Transamerica had the right to purchase was $100 per share. At a still later date Transamerica donated $75,000 in cash to the bank which was credited to the bank's surplus account, and in October, 1949, the bank declared a 300 per cent stock dividend resulting in each of the appellants receiving 30 additional shares. Following this, new agreements were separately executed by the appellants and Transamerica containing the same terms and conditions as their prior agreements except that in the case of Shephard and Musick the purchase price was reduced to $25.61 per share and in the case of Parrington the price was reduced to $25.44 per share.

Appellants Musick and Shephard were elected and served as directors of the bank for each year from 1942 to 1950, and appellant Parrington was elected and served as a director for each year from 1943 to 1950. On each occasion of being elected as such director each of the appellants took an oath

as required by the National Banking Act (12 U.S.C.A. § 73) that he would, so far as the duties devolved upon him, diligently and honestly administer the affairs of the bank, and would not knowingly violate or willingly permit to be violated any of the provisions of the statutes of the United States under which the bank had been organized; that he was the owner in good faith and in his own right of the number of shares of stock of the aggregate par value required by statute and that the same was not hypothecated or in any way pledged as security for any loan or debt. In June, 1950, each of the appellants resigned as directors of the bank, and thereupon notified respondent that the offers contained in the option agreements before referred to were revoked, and thereafter, although tendered the purchase price for their shares in accordance with the terms of such agreements by respondent, the appellants refused to transfer the same, whereupon these actions were instituted.

Appellants' primary contention here is that the agreements previously described which were enforced by the judgment appealed from are violative of the provisions of section 12 of the National Banking Act (12 U.S.C.A. § 72) prescribing the qualifications for directors of the national banks which, in part, reads as follows:

"*Qualifications* . . . Every director must own in his own right shares of the capital stock of the association of which he is a director the aggregate par value of which shall not be less than $1,000, unless the capital of the bank shall not exceed $25,000, in which case he must own in his own right shares of such capital stock the aggregate par value of which shall not be less than $500. Any director who ceases to be the owner of the required number of shares of the stock, or who becomes in any other manner disqualified, shall thereby vacate his place."

Reference is also made to section 73 reading as follows:

"Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated any of the provisions of this chapter, and that he is the owner in good faith, and in his own right, of the number of shares of stock required by this chapter, subscribed by him, or standing in his name on the books of the association, and that the same is not hypothecated, or in any way pledged, as security for any loan or debt . . ."

It is to be noted at the outset that section 72 does not denounce the purported election to the office of director of one who is not the owner of the specified number of shares or the act of serving as such director as a crime nor does it prescribe any penalty therefor. It merely declares that such a person is not qualified to act as a director and as a necessary consequence his election to the office is void or ineffectual. In this respect it would appear to differ in no manner from the statute formerly in effect in this state requiring directors of private corporations to be shareholders thereof, which was construed as not prohibiting the transfer to one of shares for the express and avowed purpose of qualifying the transferee for election to the office of director (*Webster* v. *Bartlett Estate Co.,* 35 Cal.App. 283, 286 [169 P. 702]) and under which it was also held that one elected as such director who was not a shareholder, while not a director de jure, was at least one de facto. (*O'Dea* v. *Hollywood Cemetery Assn.,* 154 Cal. 53, 69 [97 P. 1]).

Directing our attention specifically to the provisions of section 72 of the statute here in question, the necessary effect of appellants' contention is that the owner of shares in a national bank who has granted to another the right or option to acquire the same at some future date is not the owner of such shares "in his own right." We see no basis in law or logic for such conclusion. The words "in his own right" as employed in the statute can mean nothing more nor less than that, in order to be qualified as a director, one must be the beneficial as well as the legal owner of at least the minimum number of shares specified as distinguished from one who, though a stockholder of record, holds the shares for the benefit of another, such as an executor or trustee. Here each of appellants purchased and paid for the shares of stock in the bank standing in their respective names and each therefore was the owner thereof "in his own right."

Neither did the appellants cease to be the owners of such shares in their own right by reason of the fact that they executed the agreements in question whereby in certain contingencies they granted respondent the right at its option to reacquire the shares for the price and upon the terms therein stated. As said in *Warner Bros. Pictures, Inc.* v. *Brodel,* 31 Cal.2d 766, 772 [192 P.2d 949, 3 A.L.R.2d 691]: ". . . An option contract relating to the sale of land is therefore 'by no means a sale of property, but is a sale of a right to purchase.' (*Hicks* v. *Christeson,* 174 Cal. 712, 716 [164

P. 395]; see *Smith* v. *Bangham,* 156 Cal. 359, 365 [104 P. 689, 28 L.R.A.N.S. 522]; *Ware* v. *Quigley,* 176 Cal. 694, 698 [169 P. 377]; *Ludy* v. *Zumwalt,* 85 Cal.App. 119, 130-131 [259 P. 52]; *Alegretti* v. *Gardner,* 74 Cal.App. 564, 566 [241 P. 408]; *Howard* v. *D. W. Hobson Co.,* 38 Cal.App. 445, 455 [176 P. 715]; *Menzel* v. *Primm,* 6 Cal.App. 204, 209 [91 P. 754]), or, as stated in *Shaughnessy* v. *Eidsmo,* 222 Minn. 141 [23 N.W.2d 362, 363, 166 A.L.R. 435]: '. . . A contract conferring an option to purchase is . . . an irrevocable and continuing offer to sell, and conveys no interest in land to the optionee, but vests in him only a right in personam to buy at his election.' "

"An option is by no means a sale of property, but is the sale of a right to purchase" (*Hicks* v. *Christeson,* 174 Cal. 712, 716 [164 P. 395]); ▊ "An option is not a transfer of property. No title is conveyed thereby. It is a mere right of election acquired by one under a contract to accept or reject a present offer within the time therein fixed." (*Ware* v. *Quigley,* 175 Cal. 694, 698 [169 P. 377]); ▊ "An option is neither a contract of sale and purchase nor an agreement to sell and purchase land or other property. An option is a contract by which the owner of property invests another with the exclusive right to purchase such property at a stipulated sum within a limited or reasonable time in the future, and, unlike an agreement to sell and purchase, imposes no obligation to purchase upon the party to whom it is given." (*Howard* v. *D. W. Hobson Co.,* 38 Cal.App. 445, 455 [176 P. 715]; ▊ "An option is a mere offer, and unless it is accepted within the time limited, it is of no force for any purpose." (*Upton* v. *Travelers Ins. Co.,* 179 Cal. 727, 729 [178 P. 851, 2 A.L.R. 1597].)

In *Western Union Tel. Co.* v. *Brown,* 253 U.S. 101 [40 S.Ct. 460, 64 L.Ed. 803], the Supreme Court of the United States says: "An option is a privilege given by the owner of property to another, to buy the property at his election. It secures the privilege to buy, and is not, of itself, a purchase; the owner does not sell his property; he gives to another the right to buy."

▊ As related directly to the provisions of section 72, in Paton's Digest of Legal Opinions (1940 edition), page 211, it is said: "A director of a national bank gives an option on all the stock owned by him in the bank. Does the granting of this option disqualify the director from continuing in office?

"Opinion: A director by merely granting an option to a third person to buy his stock does not disqualify himself from acting as director.

"Until the third person exercises his option to buy the stock, the director owns the stock in his own right as required by statute, . . ."

█ It is equally apparent that by the agreements with which we are here concerned the appellants' shares were "not hypothecated or in any way pledged as security for any loan or debt" within the meaning of the language in section 73 of the statute. There is no suggestion that appellants were at the time of their execution or any time subsequent thereto indebted in any amount to the respondent. In the absence of such indebtedness there could be no hypothecation or pledge of security.

█ The real contention of counsel for appellants would appear to be that, while the fact that a director of a national bank who grants an option to another to acquire the shares held by him does not in all circumstances operate to disqualify him from continuing to serve as a director, a different result follows here because of the terms of the option agreement. The argument is that, inasmuch as the option price plus 5 per cent interest was to be reduced by the amount of dividends paid to appellants during the period prior to the exercise of the option, the "public policy" reflected by the statute, if not the terms thereof, is violated. In support of this it is said that directors of national banks have a public duty not only to the shareholders but to the depositors; that the purpose of requiring directors to be shareholders is that their own interests, springing from their investment therein, will induce them to act in a manner most beneficial to the interests of the bank, and, inasmuch as under the terms of the agreements here the price which they would receive upon the exercise of the option might be greatly reduced below the then true value of the shares by the dividends paid thereon prior to the exercise thereof, their incentive to act in the best interests of the bank was thereby destroyed or lessened. The argument to say the least is a strange one coming as it does from the appellants. They were under no duty to continue as directors, and by the simple act of resigning as such the respondent would have been obligated to exercise its option or failing to do so appellants would be at liberty to dispose of their shares to others at whatever price

they might obtain therefor. The same result which appellants profess to believe renders the agreements contrary to public policy would occur if a *definite price* were fixed in the option without deduction for dividends paid, for it is entirely possible that at the time of the exercise of the option the market value of the shares might be considerably greater than that specified in the option.

Nor do we see any force in the further argument that because respondent was the only shareholder of the bank other than appellants and the two other directors, the agreement had the necessary effect of making the appellants subservient to the respondent in the discharge of their duties as directors. The answer is that the agreements do not purport to lay any such obligation upon the appellants. As a majority of the board of directors they had full freedom of action. The fact, as they purported to testify, that they usually followed suggestions and recommendations made by the respondent is of no significance in determining the validity of the agreements in question. We see nothing legally or morally wrong in the fact that one who owns all or the great majority of the outstanding shares in a banking corporation makes suggestions and recommendations to the board of directors thereof with respect to its operation and management. Unless appellants desire to be understood as saying that they were so recreant to their duty as directors of the bank that they wilfully acted upon the suggestions of respondent when convinced that such action was inimical to the best interests of the bank, no odium attaches to them by reason of the fact that they may have acted from time to time in accordance with respondent's suggestions. If on the other hand they wilfully violated their trust as directors they may hardly be heard to plead in justification that they were induced so to do by respondent when neither under the terms of the agreements nor otherwise were they under compulsion to do so.

It may be noted however that despite appellants' attempts to make it appear that they were subservient to the wishes of and dominated by the respondent in the discharge of their duties as directors of the bank, they did not hesitate to act contrary thereto when their own interests dictated otherwise. When in June, 1950, respondent was desirous of selling the assets of the bank to the Bank of America, defendants strenuously objected thereto until respondent acceded to their demand that the purchaser pay to the bank for distribution

to its stockholders at least $305,000; appellants frankly admitting that their insistence upon this requirement was solely by reason of the fact that they then had determined to repudiate their agreement with respondent, which, if successful, would result in each of the appellants receiving an additional sum of $312.50 per share by reason of this additional payment alone. Similarly on a previous occasion when respondent suggested to the directors of the bank the desirability of increasing the dividend rate upon its stock, appellants refused to accept this suggestion because each of them believed that such increase would be contrary to his best financial interest in the event respondent should exercise its rights under the option agreements.

It is not surprising that the testimony of appellants Shephard and Musick (appellant Parrington did not testify) whereby they undertook to cast aspersions upon their conduct as directors did not impress the trial judge who, when rendering his decision, remarked: "In view of their long experience in the banking business, and particularly in this particular bank, I couldn't help but wonder if they were not attempting to disparage themselves by their conduct with the hope that thereby they would be successful in this lawsuit and make a financial gain."

The trial court found, and the finding is amply supported by the evidence, that "The written agreements . . . neither in nor of themselves, nor when the same are considered in the light of the circumstances under which they were executed and delivered, or considered in view of the conduct of the parties thereto after the execution and delivery thereof and during the time after 1941, when the defendants were directors of The Bank—did not require, cause, or induce, nor did any of such written agreements tend to require, cause, or induce, the defendants, or any of them, to violate their respective oaths as directors of The Bank, or, in any manner, to abandon or surrender their respective independent rights, duties, or obligations as such directors, nor did said or any of said agreements, the said circumstances of the execution and delivery thereof, nor the acts or conduct of the parties thereto after the execution and delivery thereof, in any manner, require, cause, or induce or tend to require, cause or induce, the or any of the defendants, as such directors, to neglect, abandon, surrender, or delegate their respective independent rights, obligations, duties, votes, or actions, or any thereof, in or about the affairs of The Bank."

Not only, as indicated by the foregoing finding, was there nothing in the agreements themselves to induce or tend to induce the appellants to act contrary to their duties as directors, but the court further found that they were not induced or caused so to do by any recommendation or suggestion of respondent. The trial court's finding in this respect, also supported by the evidence, is as follows:

"In the operation and the conducting of the usual and ordinary affairs of The Bank, such as—by way of illustration—investments, discounts, making of loans, employment of personnel, fixing of salaries of officers and employees, fixing of directors' fees, for attendance at regular or special meetings of the Board of Directors, or acting as a member of the examining committee, plaintiff, during the period from June, 1941, to the time when the defendants resigned as directors of The Bank, did not in any manner make any requests or suggestions respecting the acts or conduct of the defendants, or any of them, as such directors. In certain limited instances involving matters of high level policy—such as adoption by the Board of Directors of (a) a group life insurance and group medical insurance plan covering the employees of The Bank; (b) a contract employing specialists on the staff of the Bank of America National Trust and Savings Association to conduct audits and give assistance to the officers and employees of The Bank; (c) a retirement plan for The Bank's employees; and (d) construction of a new banking quarters, including the exchange of real property in connection with acquiring a site for the construction of a new building and a parking lot for customers of the Bank adjoining same, plaintiff initiated the programs and suggested and recommended to the Board of Directors of The Bank that favorable action be taken thereon, and such requested or suggested action was taken. . . . That in each instance where favorable action was taken by the Board of Directors with respect to the high level policy matters above referred to, as suggested or requested by plaintiff, such action was in the best interest of the Bank and the request or suggestion of the plaintiff in such instances was in all respects proper."

We fail to see anything inherently unlawful or contrary to public policy in an agreement whereby the sole stockholder of a corporation sells some of its shares to those who are to be connected with its operation or management as officers or employees with a reservation of the right to

repurchase the shares at a stipulated price should the purchasers cease their connection with the corporation. Indeed this is now a common practice in both large and small corporations. As was said in *Halsey* v. *Boomer*, 236 Mich. 328 [210 N.W. 209, 48 A.L.R. 622, 624]: "When a man, as here, owns the entire interest at the time of incorporation and is willing or desirous that an employee purchase a few shares of its stock, we think no question of public policy will prevent him from so providing on the issuance of such stock to an employee that he shall have the right to secure its return to him should such person leave the employ of the corporation. He thus prevents any person not directly interested in the work of the corporation from securing an interest therein, and we know of no reason why this may not be done."

In this same connection the following language from the opinion in *Smith* v. *San Francisco & N. P. Ry. Co.*, 115 Cal. 584, 600 [47 P. 582, 56 Am.St.Rep. 119, 35 L.R.A. 309], is apposite here: " 'If there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' It is not in violation of any rule or principle of law for stockholders, who own a majority of the stock in a corporation, to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation, and for this purpose, to appoint one or more proxies who shall vote in such a way as will carry out their plan."

While it is true that neither pure motives nor honest belief in the validity of an illegal bargain will save it from condemnation, it is not without significance that the appellants here, two of whom are experienced bankers and the other is a member of the Bar, at all times prior to their resignation from the bank (a period of nine years in the case of the former and seven and a half years in the case of the latter) seemingly did not regard the agreements as violative either of the statute or the public policy evidenced thereby in view of the fact that annually upon his election as director each took the statutory oath prescribed by section 73 that he would diligently and honestly administer the affairs of the bank and not knowingly violate or willingly permit to be violated any provisions of the statute and that he

was the owner in good faith and in his own right of the requisite number of shares and that the same were not hypothecated or in any way pledged as security for any loan or debt, for otherwise each was clearly guilty of perjury.

Appellants place principal reliance upon the case of *Tooker* v. *Inter-County Title Guar. & Mtg. Co.*, 295 N.Y. 386 [68 N.E.2d 179, 167 A.L.R. 385] which involved a similar statute of New York. While the statute there was somewhat more comprehensive in its terms and the language of the opinion is, to say the least, obscure; the case is distinguishable. There by the terms of the contract between the plaintiff who had purchased the shares from the defendant the former unconditionally agreed to sell and the latter unconditionally agreed to buy the shares in the event plaintiff should cease to be a director of the bank. Inasmuch as the price to be paid in such event was to be the then book value of the shares but not less than the amount paid therefor by the plaintiff, the court concluded that the latter thereby ''was equipped to free himself in a substantial degree from the chance of financial loss incident to record ownership of his qualifying shares, with the result that his sense of the character of his duty as a director may well have been reduced in like measure.'' While the reasoning of the court is somewhat tenuous, the agreements here are quite different from that involved in the cited case. Appellant had no assurance that in the event they should cease to be directors respondent would exercise its option or right to purchase their shares, and if it did not do so and appellants then desired to sell their shares the price which they could reasonably expect to receive therefor was the then market value, if any, of the shares. There was no guarantee against loss. It is to be noted also that while, as stated, the statute there involved was somewhat more comprehensive than that with which we are here concerned, the court expressly said: ''Manifestly, the transaction was designed to qualify the plaintiff for election as a director of the bank. Transfer of bank stock for the purpose of so qualifying the transferee is not obnoxious to the statute. *Cf. Matter of Ringler & Co.*, 204 N.Y. 30, 37 [97 N.E. 593, 595, Ann.Cas. 1913C 1036].''

Appellants also contend that the agreements constitute a violation of the so-called Clayton Act (15 U.S.C.A. § 18) which provides generally that no corporation engaged in commerce shall acquire directly or indirectly the whole or any part of the stock of another corporation engaged in commerce

"where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly."

This contention was not presented to the trial court and is advanced for the first time upon appeal. The record is devoid of any evidence that the acquisition by respondent of the stock of the bank operated "substantially to lessen competition or to tend to create a monopoly." In seeming recognition of this appellants ask this court to take judicial notice of the order of the Board of Governors of the Federal Reserve System in the matter of Transamerica Corporation rendered after the trial of the instant proceeding. To this end they have included in an appendix to their opening brief a copy of the certain portions of the order in question. Assuming without deciding that we may properly take judicial notice of this action of the federal reserve board, there are several reasons why it cannot affect the judgment herein. First and foremost, it is conceded that the board order is not final inasmuch as it is now pending upon appeal in the United States Circuit Court of Appeals for the Third Circuit. Secondly, an examination of the portions of the order to which counsel direct our attention does not disclose that the federal reserve board undertook to determine the validity of the agreements here involved. True in the course of its order or opinion mention is made of the fact that respondent followed the practice disclosed by these agreements in the acquisition of the stock of other banks, but we fail to find therein any suggestion that this in and of itself constituted a violation of the Clayton Act. What it did determine was that by acquiring the stock of numerous banks in the States of California, Oregon, Nevada, Arizona, and Washington enumerated in the order, the effect thereof was to materially lessen competition and hence the acquisition of the stock of such banks was in violation of the act. We are not here concerned with the question as to whether or not the respondent in acquiring the stock of a large number of banks, including that here involved, was guilty of a violation of the Clayton Act. Rather the question here is whether after having acquired such stock respondent could sell certain of the shares to the appellants under the terms of the agreements here involved. ▇▇▇ Moreover, it is not the acquisition of stock in other corporations or the means employed in doing so that is denounced by the Clayton Act but only when the effect thereof is to substantially lessen competition or tends to create

a monopoly. This is clearly pointed out in *Aluminum Co. of America* v. *Federal Trade Com.,* 284 F. 401, certiorari denied, 261 U.S. 616 [43 S.Ct. 362, 67 L.Ed. 828], where it is said: "Clearly the object to which the section is directed is not the mere acquisition of stock of one corporation by another. It is the 'effect' of such acquisition upon commerce."

Not only is there no evidence here that the acquisition of the stock of the bank in question had the effect of substantially lessening competition or creating a monopoly but, what is more important, there is no evidence that such was the effect of the agreements here in suit.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 12, 1953.