[Civ. No. 5551. Fourth Dist. Dec. 20, 1957.]

FRANK J. FARA et al., Respondents, v. DANIEL WELLS, Appellant.

HAROLD J. HICKS, Respondent, v. DANIEL WELLS, Appellant.

*Assigned by Chairman of Judicial Council.

Gendel & Raskoff, David M. McGahey and Jerome H. Rhodes for Appellant.

Thompson & Colegate and Harry M. Dougherty for Respondents.

MUSSELL, J.—These appeals are from the judgments for plaintiffs in two actions against the defendant, Daniel Wells. In the first action, *Fara* v. *Wells*, the plaintiffs seek damages for the breach of a contract in which defendant agreed to sell and convey to plaintiffs certain real property, improved with

a dwelling house, in Palm Springs. In the second action, plaintiff, Harold J. Hicks, a real estate broker, sues to recover his commission on said sale. The two actions were consolidated for trial by stipulation of the parties and separate judgments were rendered by the trial court.

There is substantial evidence in the record of the following facts: On March 21, 1953, defendant Wells, who owned the residence involved, entered into an exclusive agency agreement in writing with Harold Hicks in which Wells employed Hicks, as his exclusive agent, to sell the property involved and agreed to pay a commission of five per cent on the purchase price. On January 12, 1954, Al Hoover, a salesman for the Culver Nichols Real Estate office in Palm Springs, called Mr. Bigelow at the Hicks Real Estate office and stated he had an offer on the Wells property for $24,000 and requested Bigelow to submit this offer to Wells. Wells rejected this offer and told Bigelow that an offer of not less than $27,000 would have to be made. Bigelow informed Hoover that Wells would not accept less than this amount. Later, on the same day, Hoover advised Bigelow he had an offer from one Earl Cohen in the sum of $27,000, with $7,000 down and the balance to be paid at the rate of $132 per month, including five per cent interest on the unpaid balance. Bigelow immediately informed Wells of this offer and also of an offer which the Hicks office had received from Dr. Frank Fara in which Dr. Fara offered $27,000 for the property, with $7,500 down and the balance payable at the rate of $4,000 per year, including 6 per cent interest, with the entire balance due within five years. Wells suggested to Bigelow that he attempt to get Hoover's client to increase his offer to $27,500, with a down payment of $7,500.

After this conversation with Wells, Hoover went to the Hicks office and was informed by Bigelow of the offer of Dr. Fara. Hoover then telephoned Cohen, who was then in Palm Springs, and advised him of the latest Fara offer and that he (Cohen) would have to raise his offer to $27,500 to have it considered. Cohen told Hoover he was not interested, that he would not raise his offer, and that if he couldn't buy it for his price of $27,000, he didn't want the house. After this conversation, Bigelow telephoned Wells and told him Cohen would not raise his offer and Wells then told Bigelow to close the transaction with Dr. Fara. Bigelow told Wells an escrow would be opened that day, that the papers would be mailed, and that Dr. Fara had given them a deposit of $1,000. Wells

then advised Bigelow that he would come down to Palm Springs and get his personal effects.

Wells testified that at about 11 p.m. on January 12, 1954, he received a telephone call from Hoover and that later the same evening he received a call from Cohen in which Cohen stated that he was then prepared to pay $27,500 and would be willing to pay all cash or $10,000 down or to handle it in any way Wells desired. Wells advised Cohen that he had accepted the Fara offer earlier that day and according to Wells, Cohen replied "As long as you haven't signed them (escrow) it is open for further negotiations." That it was then agreed between Cohen and Wells that they would meet at a bank the following day for the purpose of opening an escrow.

On the following morning, January 13th, around 10 o'clock, Wells called Bigelow and advised him of the offer from Cohen in the sum of $27,500 and stated he intended to take the offer. Bigelow stated that he would attempt to get Fara to match Cohen's new offer and told Wells that he should "finally clinch the deal then and there and there would be no more fooling around." Wells testified he advised Bigelow that he preferred to do business with the Hicks office and that if Bigelow could get Fara to match Cohen's offer before 11 o'clock of that day, he would do business with Fara. Fara was contacted by the Hicks office and agreed to pay $27,500 for the property, with $7,500 down and the balance payable at the rate of $4,000 a year, with unpaid balance payable at the end of five years, together with 6 per cent interest. Bigelow then telephoned Wells and a three-way telephone conversation was held between Wells, Fara and Bigelow. In this conversation Bigelow asked Wells to send a telegram to confirm the deal and further advised Wells that if the telegram was sent, Fara had a binding and irrevocable agreement. Wells agreed to send the telegram and stated he would call Cohen and tell him he would not go through with the escrow. Wells sent the telegram as requested on January 13th at about 12:28 p.m. In it he accepted the Fara offer last referred to and stated he would "come down tomorrow to remove our clothes and other belongings from the house."

Wells testified that after sending this telegram he called Cohen and advised him that the deal was off as Dr. Fara had increased his offer. About 30 minutes after the receipt of the Wells telegram accepting the terms of the Fara offer, Bigelow received another telephone call from Wells in which he was

advised that Cohen had now jumped his bid to $29,500 and Wells stated he was going to accept the new offer. Wells asked Bigelow to talk to Dr. Fara and "get him to release him (Wells) of any obligation he was under to Dr. Fara" and stated that on that basis he would pay Hicks a full five per cent commission. Wells testified that before going into escrow with Cohen and his wife and after the telephone call to Bigelow, he sent a telegram to the Hicks office advising them that because of "misinformation" he was canceling the Fara deal.

On January 14th an escrow was opened at a bank involving the property in question in which Cohen and his wife were named as the purchasers and Daniel Wells and his wife were named as the sellers. The sale of the property to Cohen for $29,500 was completed and closed as of September, 1954. The record shows that the Hicks office did not receive any commission in this transaction.

Kenneth C. Herman, a salesman in the Hicks office, testified that when Dr. Fara agreed to raise his offer to $27,500, he (Dr. Fara) insisted that Wells send a confirming telegram; that the confirmation telegram was received a short time after this conversation; that one hour later Wells telephoned again and stated that Cohen had increased his offer to $29,500 and that he intended to go into escrow but that he would pay the Hicks office the full commission.

Dr. Fara testified that he made an offer of $27,500 for the Wells home and signed a deposit receipt and deposited $1,000; that he was advised that Wells had accepted the offer; that he then signed escrow instructions, a note and a deed of trust; that on January 13, 1954, he signed another deposit receipt for the same property and that the $1,000 which he had theretofore deposited was made a part of his new offer of $27,500; that after Wells refused to carry out the terms of his agreement, the Palm Springs Escrow Company returned $900 of the $1,000 deposit; that he spent between $180 and $200 to have his mother move from Chicago to the Wells home.

The trial court found in the case of *Fara* v. *Wells* that on or about January 13, 1954, the defendant repudiated and breached his agreement with plaintiffs; that the fair market value of the real property agreed to be conveyed by defendant was at the time of said wrongful breach of said contract the sum of $30,999 and that the contract price was $27,500. Judgment was rendered that plaintiffs recover $3,599 from

the defendant and that the defendant take nothing by reason of his answer, or at all.

In the *Hicks* v. *Wells* case the court found that on or about January 12, 1954, plaintiff Hicks, through his salesman, and in accordance with a listing agreement, procured Dr. Fara and his wife as purchasers for the property involved and that they were ready, willing and able to purchase the property upon the terms, conditions and considerations satisfactory to Wells; that Wells directed plaintiff to proceed with the transaction and plaintiff then caused an escrow to be opened and instructions to be signed by the intended purchasers in conformity with the offer of Fara; that the Faras deposited $1,000 in escrow and executed a note and deed of trust in favor of Wells in accordance with the agreement; that the Faras purchased the property for $27,500. Judgment was entered for plaintiff in the sum of $1,475, his commission of 5 per cent on the purchase price of $29,500.

In the *Fara* v. *Wells* case appellant Wells attacks the findings of the trial court and first contends that the finding that plaintiffs entered into a written contract with defendant is not supported by the evidence. We do not agree with this contention. The telegram sent by Wells on January 13, 1954, was a clear and unambiguous acceptance of the Fara offer. It reads as follows:

"Doctor Fara offer of $27,500 with 7500 down payment and balance to be paid up in five years at rate of 6 percent per annum on unpaid balances is hereby accepted for purchase of house located at 1189 Buena Vista Palm Springs Mrs. Wells and I will come down tomorrow to remove our clothes and other belongings from the house. Daniel Wells."

The evidence further shows that Dr. Fara paid $1,000 on the purchase price and executed a note and deed of trust securing the balance.

In *King* v. *Stanley*, 32 Cal.2d 584, 588 [197 P.2d 321], it was held that an agreement for the purchase or sale of real property does not have to be evidenced by a formal contract drawn with technical exactness in order to be binding; that a memorandum of the agreement (Civ. Code, § 1624, subd. 4) is sufficient, and that this may be found in one paper or in several documents, including an exchange of letters or telegrams or both, or in a letter from the vendor to the purchaser which is accepted and acted upon by the latter; that the material factors to be ascertained from the written contract

are the seller, the buyer, the price to be paid, the time and manner of payment, and the property to be transferred, describing it so that it may be identified.

The essential elements of a binding contract are present in the instant case and defendant Wells entered into a binding contract to sell the property involved to Dr. Fara for the sum of $27,500.

■ Appellant claims that as the deposit receipt was not signed by Dr. Fara's wife that there was no binding agreement. It was not necessary that the contract be signed by the purchaser. The signing of the deposit receipt and the payment of a substantial sum of the purchase price by Fara was ample evidence of acceptance of the terms of the agreement on the part of the purchaser. (*Gibbs* v. *Mendoza*, 103 Cal. App. 183, 186 [284 P. 250].)

It is argued that as Mrs. Wells, who had a joint tenancy interest in the property and did not join in signing the telegram of acceptance, Fara could not hold Wells responsible for damages. ■ This argument is without merit as it is well settled that a person may legitimately contract to sell real property which he does not own, provided that when the time comes to furnish the title as agreed he is able to do so. (*Pruitt* v. *Fontana*, 143 Cal.App.2d 675, 690 [300 P.2d 371]; *Kaufman* v. *Haney*, 80 Cal.App.2d 249, 251 [182 P.2d 250].)

■ Appellant further contends that the evidence was insufficient to support the judgment for $3,599 in favor of the plaintiffs in that the value of the property in question was neither alleged nor proved. However, it is alleged in the amended complaint that "the fair market value of the real and personal property agreed to be conveyed to the plaintiffs by defendant which is set out and described in paragraph one of the complaint was and is the sum of $31,000." This allegation is a sufficient allegation that the property at the time of the breach was of that value. (*People* v. *Ellenwood*, 119 Cal. 166, 168 [51 P. 553]; *Pendergrass* v. *Fairchild*, 106 Ore. 537 [212 P. 963-964].) The instant case apparently was tried on the theory that the reasonable market value of the property was $30,999 as of the date of the breach and it appears from the entire amended complaint that plaintiffs were alleging the reasonable market value of the property as of January 13, 1954, the date of the breach and repudiation.

In section 3306 of the Civil Code the measure of damages applicable is stated as follows:

"*Breach of Agreement to convey real property.* The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land."

In *Engasser* v. *Jones,* 88 Cal.App.2d 171, 177 [198 P.2d 546], the court said:

"Many authorities hold that the question of 'bad faith' is a factual one. (*Hamaker* v. *Bryan,* 178 Cal. 128 [172 P. 391]; 25 Cal.Jur. § 265, p. 817.) It has likewise been held that a vendor is chargeable with bad faith, within the meaning of section 3306 of the Civil Code where, without just cause or excuse, he refuses to perform the contract, or where, through his own negligence, he has put it out of his power to perform. But this is not true of one who contracts to convey but is unable to do so, notwithstanding his best efforts. (Citations.)"

In *Nelson* v. *Fernando Nelson & Sons,* 5 Cal.2d 511, 517 [55 P.2d 859], the court held, in an action for damages for breach of a contract to sell realty, that where the original purchase price of a lot was $3,500 and it was sold by defendant to a *bona fide* purchaser for $5,000 and the sale was in repudiation of plaintiff's rights after notice thereof, plaintiff was entitled to the profit.

In this connection it may be observed that Wells placed a sales price of $35,000 on the property in his listing with Hicks and that in his answer Wells alleged that on or about January 13, 1954, the fair and reasonable value of the property described in plaintiffs' complaint was $29,500. We conclude that the court's finding that the fair market value of the property at the time of the breach of the contract was the sum of $30,999 is supported by the record.

In the case of *Hicks* v. *Wells* appellant contends that as a matter of law the trial court committed reversible error in finding that Hicks did not breach his fiduciary duty to appellant and that the judgment in favor of Hicks for real estate broker's commission is contrary to law. These contentions are likewise without merit. The record shows that Hicks, under an exclusive right to sell agreement, procured purchasers ready, willing and able to buy the property involved upon terms which were accepted by Wells and confirmed by

him by telegram. Upon Wells' breach of the agreement, Hicks was entitled to sue for his commission. (*Fleming* v. *Dolfin*, 214 Cal. 269, 271 [4 P.2d 776, 78 A.L.R. 585] ; *Walter* v. *Libby*, 72 Cal.App.2d 138, 141-142 [164 P.2d 21].) ▇ The finding that Hicks did not violate his fiduciary duty to appellant is supported by substantial evidence. The record shows in this connection that Wells accepted offers from both Dr. Fara and Cohen; that the Hicks office communicated the Fara offers to Wells; that Cohen stated he would go no higher than $27,000 for the property and that he was not interested; that Bigelow advised Wells of Cohen's statements; and that all offers received by the Hicks office were communicated to Wells. Wells conducted negotiations with Cohen directly and was aware of all offers made and their terms. There is no substantial evidence to support the contention that the Hicks office did not properly represent the interests of appellant Wells.

The judgments are affirmed.

Barnard, P. J., concurred.

A petition for a rehearing was denied January 15, 1958, and appellant's petition for a hearing by the Supreme Court was denied February 11, 1958.