[Civ. No. 6354.   Fourth Dist.   Dec. 16, 1960.]

W. E. SCHMIDT, Appellant, v. H. M. BECKELMAN et al.,
Respondents.

Carroll & Anderson and Thomas T. Anderson for Appellant.

Sidney Fischgrund for Respondents.

SHEPARD, J.—W. E. Schmidt, as plaintiff, brought this action to have declared void a certain "Option to Purchase Mining Property" from plaintiff, as optionor, to defendants H. M. Beckelman, C. W. Moncrieff, Don O'Dell and Blackhawk Limestone Company, as optionees, and to quiet plaintiff's title to property described in said option. Defendants filed a cross-complaint for damages for breach of the option contract. Judgment was rendered for cross-complainants on the cross-complaint for damages and against cross-defendant in the amount of $217,000. Plaintiff appeals.

Much of the material evidence as to the relations of the parties is in sharp conflict. Appellant contended that he had employed respondents as brokers to sell his mining claims and that they were acting in a fiduciary capacity; that while acting in such fiduciary capacity they concealed from him their superior factual knowledge of the true value of the

claims; that by reason thereof plaintiff had a right to and did rescind the option agreement. (Citing 9 Cal.Jur.2d 141, 199, 202, 204; *Anderson* v. *Thatcher,* 76 Cal.App.2d 50 [172 P.2d 533]; Bus. & Prof. Code, § 10131; *Bell* v. *Scudder,* 78 Cal. App.2d 448 [177 P.2d 796]; *Langford* v. *Thomas,* 200 Cal. 192 [252 P. 602]; *Williams* v. *Lockwood,* 175 Cal. 598 [166 P. 587]; *Silver* v. *Logue,* 127 Cal.App. 565 [16 P.2d 183]; *Rattray* v. *Scudder,* 28 Cal.2d 214 [169 P.2d 371, 164 A.L.R. 1356]; *Feckenscher* v. *Gamble,* 12 Cal.2d 482 [85 P.2d 885].)

While it is true that there is substantial evidence to support this contention, there was also much evidence to the contrary. Where such conflict exists, the rule is clear. ▮ As was said in *Brewer* v. *Simpson,* 53 Cal.2d 567, 583 [1, 2] [2 Cal.Rptr. 609, 349 P.2d 289]:

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact,' and 'When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' "

▮ From this rule it follows, as was said in *Horton* v. *Kyburz,* 53 Cal.2d 59, 72 [12] [346 P.2d 399]: "While on the record it may seem to some of us that, were we triers of fact, we might have reached findings differing in some respect from those declared by the trial judge, we recognize that we did not see and hear the witnesses and, hence, on conflicting evidence have neither right nor power to disagree with the trier of fact."

Reviewing the evidence in this light, the record before us shows the facts to be as follows: Appellant owned certain limestone mining claims in the San Bernardino Mountains. About one year previously appellant had attempted to sell the claims for the amount of $12,500. A Dr. Roland M. Marshall contacted respondent Beckelman at that time and gave Beckelman some ore samples, but did not inform Beckelman as to where the samples came from. Prior to September 1957, appellant attempted to work the claims, but apparently derived no commercial profit therefrom. September 9, 1957, Beckelman went to see the claims and attempted to contact appellant, leaving a message. In response to such message, appellant went to see Beckelman and volunteered an offer to sell the claims for the sum of $33,000. Beckelman required

a written statement of factual details about the claims, including a statement of the offered price. Such statement, entitled "Property Analysis and Offer" was made out by Beckelman at appellant's dictation, giving an estimated tonnage of 50,000,000 tons, and including an offer to give an option at $200 per month during investigation. Beckelman then told appellant that he had two associates, naming the other two individual respondents herein, and that he would consult them. A day or so later Beckelman again met appellant, discussed the terms that Beckelman and his associates were willing to agree to, and appellant instructed Beckelman to prepare the option at $100 per month for six months, with a purchase price of $33,000. During the same conversation, appellant told Beckelman that if respondents did not, in fact, exercise the option to buy the claims, appellant wanted respondents, after the termination of the option, to act for appellant in attempting to find some other buyer. Beckelman then explained to appellant that he was not a licensed broker. Appellant insisted that Beckelman prepare some form of sales agreement by which appellant agreed that if respondents were instrumental in selling the claims for $33,000, appellant would repay to respondents 10 per cent thereof, or $3,300.

The testimony of respondents is to the general effect that this so-called "Sales Agreement" was not to be used unless respondents did not elect to exercise their rights under the option, and that respondents never did, in fact, offer the property for sale to anyone else, nor make any attempt to operate under the so-called "Sales Agreement" because they never arrived at a decision not to elect to exercise the option. The "Sales Agreement" was never signed by any of respondents.

The two documents were drawn by Beckelman and on September 13, 1957, appellant read, approved and signed both, a copy of each being given appellant. None of the parties then knew what the fair market value of the claims was, and respondents did not make any representation to appellant as to market value. Beckelman made clear to appellant that whether or not respondents exercised the option would depend in part at least on the quality and quantity of the ore found to be available after testing and investigation.

Respondents had assays made, and received a report thereon dated September 20, 1957. A copy thereof was given to appellant. In early October, an agreement supplemental to the option agreement was signed, allowing respondents to mine

and remove ore at a royalty of approximately 10 cents per ton, with a minimum guaranty of $100 a month. In the meantime, respondents made several contacts in an effort to raise money. The testimony respecting the conferences on money indicates that the amount needed would be in the neighborhood of $175,000, including the $33,000 purchase price. From this testimony it does not appear that respondents had on hand even the amount of the purchase price money. Apparently one of the contacts transmitted information to another mining concern and sometime in October, appellant was offered $100,000 for the claims.

November 1, 1957, through his attorney, appellant notified respondents that he rescinded the option agreement and that he would accept no further payments thereon. The two $100 checks given as monthly payments to keep the option alive, were returned, uncashed, to respondents.

The amended complaint in this action was filed January 16, 1958, and the cross-complaint was filed by respondents herein February 16, 1958. It is apparent that both dates were prior to the expiration of the ultimate time limit within which respondents might have given notice of their election to exercise the option and to tender the total purchase price required thereunder.

The evidence shows that the attempted rescission of the option was unequivocal. However, the evidence is completely devoid of any testimony of any kind that respondents ever notified appellant that they were prepared to elect or did elect to exercise their option. Nowhere is there any evidence of any demand or notice from respondents to appellant requiring or requesting that appellant deed the property to respondents. Nowhere is there any evidence that respondents notified appellant that they had the money with which to meet the ultimate terms of the final purchase price. There is no testimony that respondents did, in fact, have on hand any such sum as $33,000.

The court found the fair market value of the claims to be $250,000. There is no substantial dispute in the evidence in this respect. The court found that the attempted rescission was without any just cause or excuse, and was willful. This finding is supported by the evidence. The court, after finding the value of the property to be $250,000 and the purchase price to be $33,000, simply deducted the purchase price from the value found and rendered judgment against appellant in the sum of $217,000.

## Broker-Client Relationship

Appellant first contends, as hereinbefore outlined, that a broker-client relationship existed and that the broker fraudulently concealed known facts relating to the value of the claims from the client, thereby violating the fiduciary relationship and warranting appellant's notice of rescission. Unfortunately for this contention, the trial court found on conflicting evidence that the facts upon which this contention was based were not true. Under the facts as viewed by the trial court, the so-called "Sales Agreement" was not to take effect nor become operative unless respondents decided not to exercise the option. This never happened. The notice of rescission was given in November 1958, and even the action itself and the cross-complaint of respondents herein were filed before the expiration of the ultimate time within which respondents could have finally made their election.

Respondents never signed the "Sales Agreement," nor did they at any time offer the property for sale to any other party. They never assumed to act on appellant's behalf as intermediaries with any other party. The time never arrived when they might finally elect to act or not to act under said "Sales Agreement." The court's finding is supported by evidence.

We cannot, on appeal, recognize any merit in appellant's contention. Because of the foregoing, appellant's contentions numbered 2, 3, 4, 5 and 9, relating to the rules of conduct between principal and agent, the fiduciary duties of an agent, and rescission because of a violation of such duties have no application. Further discussion thereof is unnecessary.

## No Agreement of Sale Exists Until Option Is Exercised

Appellant next contends that there was no exercise nor attempted exercise of the option, and that therefore no binding "Agreement to Convey an Estate in Real Property" ever came into existence within the meaning of Civil Code, section 3306. With this contention we agree. The evidence is entirely devoid of any suggestion or notice of any kind that respondents did, in fact, elect to buy the property for the sum of $33,000, or any other sum, or that they even had on hand any such sum. True, the notice of rescission indicates that appellant would not accept any further money *on the option*. The form of the notice of rescission and the return of respondents' checks for monthly payments would ordinarily make

any further tender of the monthly payments unnecessary since such announced attitude by the optionor would amount to a waiver of such tender. (*Pereira* v. *Toscano*, 84 Cal.App. 526 [258 P. 429]; *Vaughan* v. *Roberts*, 45 Cal.App.2d 246 [113 P.2d 884]; *Lundblade* v. *Boyes*, 101 Cal.App. 741 [282 P. 399]; *Groobman* v. *Kirk*, 159 Cal.App.2d 117 [323 P.2d 867].)

If the option had ripened into an agreement to convey, the evidence was clearly sufficient to support the court's application of the measure of damages provided by the last clause of Civil Code, section 3306, providing for damages in case of bad faith on the basis of the "difference between the price agreed to be paid and the value of the estate agreed to be conveyed." (*Pixley* v. *First Federal Sav. & Loan Assn.*, 110 Cal.App.2d 427, 432 [5] [243 P.2d 100]; *Fara* v. *Wells*, 156 Cal.App.2d 322, 329 [319 P.2d 394]; *Eastwood Homes, Inc.* v. *Hudson*, 161 Cal.App.2d 532, 543 [10] [327 P.2d 29].)

▉ However, some notice either orally or in writing or by some act is required of the optionee to the optionor that the optionee does, in fact, elect to exercise the option, unless the option itself provides a specific form of notice. Whatever method the optionee uses to convey to the optionor knowledge that the optionee does, in fact, elect to exercise the option, it must convey the information to the optionor that the option is, in fact, exercised, and the acceptance must correspond with the offer, meeting the offer at all points as it is made. (*Caldwell* v. *Dalary Mines, Inc.*, 68 Cal.App.2d 180, 184 [156 P.2d 52]; *Transamerica Corp.* v. *Parrington*, 115 Cal.App.2d 346, 352 [6] [252 P.2d 385]; *Auslen* v. *Johnson*, 118 Cal.App.2d 319, 322 [4] [257 P.2d 664].) ▉ As was said in 55 American Jurisprudence 511, note 24:

"In cases involving option contracts which require a tender as part of an indication of acceptance, in order to exercise an option to purchase, even though the optionee may be excused from making a timely tender by reason of repudiation of the contract by the optionor he must, under the familiar rule of contracts relating to offer and acceptance, in order to establish any equitable contractual relations with the latter, indicate to him definitely an acceptance and willingness to proceed with the contemplated transaction."

▉ An option is not "an agreement to convey." As was said in *Caras* v. *Parker*, 149 Cal.App.2d 621, 626, 627 [309 P.2d 104]: " ' "The distinction between a contract to purchase or sell real estate and an option to purchase is, that the contract to purchase or sell creates a mutual obligation on the

one party to sell and on the other to purchase, while an option merely gives the right to purchase within a limited time without imposing any obligation to purchase.'' [Citation.] In other words, an option is a contract by which the owner of property invests another with the exclusive right to purchase said property at a stipulated sum within a limited or reasonable time in the future. . . .'

''.  .   .   .   .   .   .   .   .   .   .   .   .

''In an option contract for the purchase of real property there is no mutuality of remedy until the acceptance of the option. Upon the acceptance of the offer by the buyer, there is then created the contract of sale and it is this contract which gives rise to the remedy for specific performance.''

In *Staudigl* v. *Harper,* 76 Cal.App.2d 439, 445 [173 P.2d 343], the court describes legal effect of an option in the following language: ''An option is not a sale of property, but the sale of the right to purchase. [Citation.] It merely gives the optionee a right of election to purchase within a limited time in the future [citation], and vests no estate in the property. The amount of the consideration paid for an option does not have the effect of changing the nature of the transaction, nor does it impart any greater legal effect to the option.'' (See also *Transamerica Corp.* v. *Parrington, supra,* [4, 5] ; *Palmer* v. *Fleming,* 167 Cal.App.2d 108, 111 [3] [334 P.2d 23].)

Under the option here under consideration, respondents had the right to keep the option open by the payment of $100 per month, and having so kept it in force, to mine and remove ore on a 10 cents per ton royalty basis. This mining portion of the agreement was, of course, to the extent of the reciprocal obligations in the event the mining took place, bilateral, and actual damages under Civil Code, section 3300, might well have been awarded for its breach had evidence thereof been offered. However, there was no such evidence.

No authorities have been cited by either party, nor have we been able after extensive research to find any, which discuss the measure of damages in case of a breach of an option to buy real property where there was never any election to exercise the option. We are satisfied, however, that reason does not support the mandatory application of the harshly rigid rule provided by the last clause of Civil Code, section 3306. That rule is based on a bilateral agreement to convey in which the seller has the right to enforce the agreement against the buyer. An analysis of the facts here pre-

sented demonstrates the clear difference between the value of an option agreement and a full-fledged agreement to convey. In the case of the option, the optionee has never been bound to pay the purchase price. The optionor has no means of knowing whether or not the optionee will ever elect to so bind himself. Many events could occur between the date of breach and the date of possible final election to exercise or not to exercise the option. ■■■■ The true measure of damages would appear to be actual damages under the provisions of section 3300. An item of damage, of course, would be the value, not of the land itself, but of the conditional right to purchase the land, less the amount agreed to be paid. What this value was would be a factual matter for determination by the court under all the circumstances of the case. No evidence was here presented as to such value, nor was any offered or received.

Civil Code, section 3359, provides that "Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."

Considerations of reason and justice are to be found in many parts of our law to ameliorate the harshness of fixed rules. As an example thereof, Civil Code, section 3391, provides that "Specific performance cannot be enforced against a party . . . [if] he has not received an adequate consideration . . . or [if] it is not, as to him, just and reasonable." In considering whether or not the damages were reasonable, all of the circumstances involved must be considered. In the case here at bar, the purchase price apparently agreed upon by the parties was so entirely disproportionate to the value as testified to in court and the general market experience of the buyers was such that one is led to strongly suspect that either the buyers took unfair advantage of the ignorance of the seller or the parties were affected in their estimate of value by the grandiose dreams common to many prospectors.

■■■■ In any event, the judgment for $217,000 damages for breach of an option agreement on the sale of real property where no changes have been demonstrated to have occurred in such value between the time of the contract and the breach, would seem to exemplify not only the unreasonableness of the damages but also the harshness of an attempted application of the last clause of Civil Code, section 3306.

Discussion of other points raised by appellant is unnecessary.

The judgment is reversed.

Griffin, P. J., and Coughlin, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 8, 1961. Peters, J., White, J., and Dooling, J., were of the opinion that the petition should be granted.